UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYSCOM (USA) INC., <br> Plaintiff, <br> v. <br> NAKAJIMA USA, INC., *et al.*, <br> Defendants. | Case No. CV 14-07137-AB (JPRx) <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> **TRIAL DATE: JUNE 4, 2019** |

This matter was tried before this Court, sitting without a jury, on June 4, 2019.

Robert M. Gilchrest of Gilchrest Law Group appeared on behalf of Plaintiff Syscom (USA), Inc. Marshall G. Mintz of Mintz Law Group appeared on behalf of Defendant Shinji Nakajima.

Having heard the admissible evidence presented by the parties, the arguments of counsel, and having considered the demeanor and credibility of the witnesses and all papers and exhibits presented by the parties for purposes of this trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

///

///

1.

**FINDINGS OF FACT**

**A.  Background of The Parties and Their Relationships**

1. Plaintiff Syscom (USA), Inc. ("Syscom") is a corporation duly incorporated under the laws of the State of New York.  Complaint ("Compl."), ¶ 2 (Dkt. No. 1).

2. Syscom provides business consulting and Enterprise Resource Planning ("ERP") services, software implementation services, computer systems installation and maintenance services, computer networking services, cloud services, and operational maintenance and customer support services.  Declaration of Hirona Nagai ("Nagai Decl."), ¶ 3 (Dkt. No. 125).

3. Defendant Nakajima USA, Inc. ("Nakajima USA") is a corporation duly incorporated under the laws of the State of California.  Compl., ¶ 3.

4. Nakajima USA is a wholly owned subsidiary of Nakajima Co., Ltd. ("Nakajima Japan").  Trial Transcript ("Trial Tr.") at 99:21–24 (Dkt. No. 134).

5. Nakajima Japan formed Nakajima USA in 2000 to sell plush, seasonal toys, lifestyle goods, and trend character merchandise within the United States, including Sanrio Co., Ltd.'s ("Sanrio") Hello Kitty products, Peanuts Worldwide LLC ("Peanuts Worldwide") Peanuts products, and various collectibles from Disney and Warner Brothers, pursuant to Nakajima Japan's licenses with the owners of the brands.  Declaration of Mike Ina ("Ina Decl."), ¶ 2 (Dkt. No. 113); Nagai Decl., ¶ 7.

6. Defendant Neko World, Inc. ("Neko World") is a corporation duly incorporated under the laws of the State of California.  Compl., ¶ 4.

7. Defendant Torrance Trading, Inc. ("Torrance Trading") is a corporation duly incorporated under the laws of the State of California.  Compl., ¶ 5.

8. Defendant Shinji Nakajima ("Defendant" or "Mr. Nakajima") is an individual who resides in and is a citizen of California.  Compl., ¶ 6.

9. Mr. Nakajima served as the President, Chief Executive Officer, Secretary, Chief Financial Officer, Chairperson and sole member of the Board of Directors of Nakajima USA. Trial Tr. at 50:17–51:5, 51:23–52:15.

10. Mr. Nakajima also served as the President, Chief Executive Officer, and member of the Board of Directors of Nakajima Japan. Trial Tr. at 52:16–53:11.

11. Prior to August 2014, Mr. Nakajima, his father and his brother occupied three of the five seats on the Board of Directors of Nakajima Japan. Trial Tr. at 52:19–53:11.

**B.     The Arbitration and the Present Litigation**

12. On September 12, 2014, Syscom filed the instant suit against Nakajima USA, Neko World, Torrance Trading (collectively "Corporate Defendants") and Mr. Nakajima alleging claims of: (1) breach of contract; (2) account stated; (3) open book account; and (4) fraudulent conveyance based on Defendants' alleged breach of a 2012 Master Service Agreement ("MSA") between Syscom and Nakajima USA. *See generally* Compl.

13. On January 29, 2016, the Court entered an Order granting the parties' stipulation to stay the litigation pending the outcome of arbitration. Dkt. No. 55.

14. On July 23, 2019, the Court confirmed a final arbitration award in the American Arbitration Association case styled as *Syscom (USA), Inc. v. Nakajima USA, Inc. et al.*, ICDR Case No. 01-15-0002-3159, holding the Corporate Defendants jointly and severally liable to Syscom for $615,894.05 in damages for breach of contract, plus attorneys' fees, interest, and arbitration costs. The arbitrator dismissed the claims against Mr. Nakajima without prejudice due to lack of jurisdiction. Dkt. Nos. 132-2, 137.

15. As a result, at trial, Syscom solely sought to establish Mr. Nakajima's personal liability for the final arbitration award and the forthcoming judgment in this case based on two theories: (1) alter ego doctrine; and (2) fraudulent conveyance. Trial Tr. at 10:19–11:12.

**C.     The 2012 Master Service Agreement**

16.     Prior to 2012, Nakajima USA utilized Sanrio's ERP system to manage its data, including inventory, sales, and expenses for an annual cost of $500,000. Declaration of Shinji Nakajima ("Nakajima Decl."), ¶ 3 (Exhibit ("Ex.") 231).

17.     On December 7, 2012, Syscom and Nakajima USA entered into a MSA whereby Syscom agreed to customize and implement a new, presumably less costly, ERP system for Nakajima USA. Nakajima Decl., ¶ 4; Ex. 4.

**D.     Nakajima USA Finances and Operations**

18.     Nakajima Japan consistently financed and supported Nakajima USA's business operations. Ina Decl., ¶ 4; Trial Tr. at 112:14–113:1, 113:23–25.

19.     Nakajima Japan's Chief Financial Officer, Nobuo Onodera, and other members of Nakajima Japan's Board of Directors, dictated Nakajima USA's financial structure. Ina Decl., ¶¶ 3, 4.

20.     Nakajima Japan periodically loaned money to Nakajima USA against the receivables generated by Nakajima USA, and Nakajima USA would repay the loans upon receipt of sales revenue. Ina Decl., ¶¶ 3, 4; Declaration of Masahide Nakagawa ("Nakagawa Decl."), ¶ 4 (Dkt. No. 114).

21.     Nakajima USA was dependent on loan funds from Nakajima Japan to finance its operations and keep its doors open. Trial Tr. at 113:18–114:15. As a result, Nakajima USA normally kept Nakajima Japan informed of its business operations and decisions. Ina Decl., ¶ 5.

22.     In 2013, Nakajima USA reported gross receipts of nearly $33 million and gross profits of nearly $16 million. Trial Tr. at 124:3–125:10; Ex. 323. By the end of 2014, Nakajima USA's reported gross receipts fell to just over $7 million and gross profits fell to just over $2 million. *Id.* The sale of Sanrio-licensed products accounted for eighty percent of Nakajima USA's gross receipts. Trial Tr. at 89:3–7.

23.     Beginning in approximately December 2013, Masahide Nakagawa served as Nakajima USA's Accountant, and Mr. Nakagawa later performed accounting

functions for Neko World and Torrance Trading, including managing the companies' capital structures. Nakagawa Decl., ¶ 2; Trial Tr. at 96:17–19, 103:10–12, 103:18–21.

24. Mr. Nakagawa received no direction from Mr. Nakajima regarding how to handle the Corporate Defendants' accounting matters. Trial Tr. at 96:24–97:1.

### E. Nakajima USA Closure

25. Due to a decline in sales, Nakajima USA eventually closed its retail stores and relocated its corporate offices. Ina Decl., ¶¶ 7, 8.

26. Because Nakajima USA faced liability for unpaid rent after closing its retail stores, Nakajima Japan's Board of Directors decided to form new businesses to sell Sanrio and Peanuts Worldwide branded products. Ina Decl., ¶¶ 8, 10, 11; Trial Tr. at 66:17–67:7.

27. In January 2014, Nakajima Japan formed Torrance Trading to sell Peanuts Worldwide-licensed merchandise. Exs. 215, 218; Ina Decl., ¶ 11. Mr. Nakajima served as the President, Chief Executive Officer, Secretary, and sole member of the Board of Directors of Torrance Trading. Exs. 217, 218.

28. On or around January 16, 2014, Syscom became aware of the creation of a new business that would sell Peanuts branded products. Declaration of Tom Huang ("Huang Decl."), ¶ 5 (Dkt. No. 118); Ex. 223.

29. In April 2014, Nakajima Japan formed Neko World to sell Sanrio-licensed merchandise. Ex. 209; Ina Decl., ¶ 10. Mr. Nakajima served as the Chief Executive Officer, Secretary, Chief Financial Officer, and sole member of the Board of Directors of Neko World. Ex. 213.

30. On or around April 15, 2014, Syscom became aware of the creation of a new business that would sell Hello Kitty branded products. Huang Decl., ¶ 11; Trial Tr. at 34:14–17, 36:3–5.

31. By February 2014, Nakajima USA had become delinquent in paying Syscom for services related to implementing the new ERP system. Ina Decl., ¶ 12; Nagai Decl., ¶ 27.

32. Nakajima USA entered into negotiations to renew the licenses with Sanrio and Peanuts Worldwide before the licenses expired in 2013. Nakajima Decl., ¶¶ 10, 11; Trial Tr. at 61:1–3.

33. During its negotiations with Sanrio in early 2014, Nakajima USA began discussing internally whether it should proceed with Syscom's ERP system or continue using Sanrio's ERP system. Trial Tr. at 150:14–20. No one at Nakajima USA or Nakajima Japan informed Syscom of these internal discussions; and as a result, Syscom continued to work on developing a customized ERP system for Nakajima USA. Trial Tr. at 151:1–13, 154:16–155:25.

34. In January 2014, Peanuts Worldwide and Torrance Trading entered into a license agreement in which Peanuts Worldwide granted Torrance Trading the non-exclusive right to manufacture, distribute, sell, and advertise Peanuts products. Ex. 221.

35. In July 2014, Nakajima USA, Neko World and Sanrio entered into an agreement extending the original license between Sanrio and Nakajima USA and assigning it to Neko World. Ex. 103; Trial Tr. at 67:8–18.

36. Neko World also agreed to continue to use Sanrio's ERP system for a reduced annual cost of $162,000. Trial Tr. at 153:9–15.

37. The decision to terminate the 2012 MSA was primarily made by Mike Ina (Corporate Defendants' Executive Officer), Chikako Horikoshi (Nakajima USA's Vice President), Nobuo Onodera (Nakajima Japan's Chief Financial Officer), Masahide Nakagawa (Corporate Defendants' Accountant), and legal counsel. Trial Tr. at 157:6–18.

38. At Mike Ina's direction, Nakajima USA terminated its MSA with Syscom on August 22, 2014, in a letter explaining that Nakajima USA would be unable to meet its contractual obligations under the MSA after it ceased business operations. Ex. 17; Nagai Decl., ¶ 31; Trial Tr. at 105:20–22, 159:6–10.

39. Nakajima USA sold much of its inventory in 2014 at regular prices during the normal course of business and at discounted prices during a warehouse sale event. Nakagawa Decl., ¶ 5.

40. Nakajima Japan purchased Nakajima USA's remaining inventory for $2 million as settlement of loans owed and then invested the $2 million of inventory into Neko World. *Id.*; Ina Decl., ¶ 16.

41. Neko World also hired Nakajima USA's key corporate employees after they were terminated. Trial Tr. at 85:16–87:21.

42. Mr. Nakajima did not instruct anyone at Nakajima USA to transfer its assets to Neko World, Torrance Trading, or other third parties. Trial Tr. at 105:2–9.

43. Mr. Nakajima did not appropriate Nakajima USA, Neko World, or Torrance Trading's inventory or equipment for his own use. Trial Tr. at 102:6–22.

44. Mr. Nakajima received a salary from Nakajima USA but no other financial compensation from the Corporate Defendants. Trial Tr. at 101:4–18, 101:22–23, 102:4–5.

45. On or around September 1, 2014, Neko World began selling Sanrio-licensed products. Trial Tr. at 124:20–125:3.

46. In 2015, Nakajima USA reported gross receipts of $0 and gross profits of $0. Ex. 325.

## CONCLUSIONS OF LAW

**A. Jurisdiction**

47. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff is a citizen of New York. Defendants are citizens of California. There is therefore complete diversity of citizenship between the parties. In addition, the amount in controversy exceeds $75,000. Compl., ¶ 8. This Court therefore properly has diversity jurisdiction over the case.

///

///

**B. Discussion**

48. For the reasons discussed below, the Court concludes that Syscom has failed to meet its burden of showing by a preponderance of the evidence that Mr. Nakajima exclusively dominated, controlled, and influenced the Corporate Defendants' actions, and that the Corporate Defendants were a mere shell for Mr. Nakajima's personal use. Moreover, Syscom has not presented sufficient evidence of bad faith conduct on the part of Mr. Nakajima to justify a finding of alter ego liability.

49. Likewise, Syscom has failed to establish by a preponderance of the evidence that Mr. Nakajima coordinated or controlled the transfer of assets between the Corporate Defendants.

**1. Alter Ego Liability**

50. California courts have recognized that "it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity." *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (1991).

51. Under California law, an alter ego relationship exists where "(1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation . . . would sanction a fraud or promote injustice." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677 (9th Cir. 2017) (alteration in original) (quoting *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003)).

52. Indeed, "[a]lter ego is an extreme remedy, sparingly used" to prevent inequity. *Hasso v. Hapke*, 227 Cal. App. 4th 107, 155 (2014).

53. With respect to the first prong, relevant factors to take into consideration include the commingling of funds and assets of the two entities, identical equitable ownership, use of the same offices and employees, inadequate capitalization, disregard of corporate formalities, identical directors and officers, lack of segregation

8.

of corporate records, and use of one as a mere shell for the affairs of the other. *See Toho-Towa Co, Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1108–09 (2013); *see also Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538–39 (2000).

54. However, "[t]here is no litmus test" under California law to determine when a court should impose alter ego liability. *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985). "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539.

55. The ultimate question is not whether any individual factor weighs in favor of or against holding one entity liable for the acts of another, or even by adding up the number of factors that counsel for or against alter ego liability. Rather, "[t]he essence of the alter ego doctrine is that justice be done." *Mesler*, 39 Cal. 3d at 301.

56. Given the importance of the corporate form, the doctrine of alter ego liability should be narrowly applied to circumstances where it is truly necessary to avoid injustice. *Mesler*, 39 Cal. 3d at 301.

57. "The injustice that allows a corporate veil to be pierced is not a general notion of injustice; rather, it is the injustice that results only when corporate separateness is illusory." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004).

58. If, under the circumstances of the case, it would be inequitable to treat the corporate entities as distinct, courts should avoid that inequitable result by disregarding the corporate separateness and imposing alter ego liability "to reach an equitable result." *Mesler*, 39 Cal. 3d at 301 (internal quotes omitted).

///
///
///
///

### a. Syscom Has Not Met its Burden of Proving that Mr. Nakajima and the Corporate Defendants Shared a Unity of Interests or Perpetrated an Injustice

59. Syscom argues that both the unity of interest and injustice elements are satisfied here. Syscom cites the following assertions and facts in support of its argument that Mr. Nakajima and the Corporate Defendants have a unity of interest:

60. Mr. Nakajima oversaw the transactions that left Nakajima USA with insufficient revenue to fulfill its contractual obligations under the 2012 MSA because he was the President, CEO, and majority shareholder of each Corporate Defendant. Trial Tr. at 50:17–51:5, 51:23–52:15; Exs. 217, 218, 213.

61. In addition, Mr. Nakajima served as the President and CEO of Nakajima Japan, and along with his father and his brother, occupied three of the five seats on Nakajima Japan's Board of Directors. Trial Tr. at 52:16–53:11.

62. Nakajima USA was not adequately capitalized because Nakajima Japan consistently financed and supported Nakajima USA's business operations. Ina Decl., ¶ 4; Trial Tr. at 112:14–113:1, 113:23–25.

63. Nakajima USA was dependent on loan funds from Nakajima Japan to finance its operations and keep its doors open. Trial Tr. at 113:18–114:15. As a result, Nakajima USA normally kept Nakajima Japan informed of its business operations and decisions. Ina Decl., ¶ 5.

64. Nakajima Japan also transferred funds and other assets, such as licenses and merchandise, between it and the Corporate Defendants, leaving Nakajima USA with insufficient capital to satisfy its debts. Exs. 103, 221; Trial Tr. at 67:8–18, 85:16–87:21; Nakagawa Decl., ¶ 5; Ina Decl., ¶ 16.

65. Prior to Nakajima USA's termination of the 2012 MSA, no one at Nakajima USA or Nakajima Japan informed Syscom of internal discussions regarding whether Nakajima USA would proceed with Syscom's ERP system or continue using Sanrio's ERP system. Trial Tr. at 150:14–20, 151:1–13, 153:9–15, 154:16–155:25.

66. Syscom also argues that injustice will result if Mr. Nakajima is not found to be the Corporate Defendants' alter ego because the Corporate Defendants—particularly Nakajima USA—do not have enough income or liquid assets to pay Syscom, and because Mr. Nakajima is a bad actor who orchestrated this unfair outcome.

67. Mr. Nakajima presents evidence and testimony to counter many of these assertions:

68. Nakajima USA is a wholly owned subsidiary of Nakajima Japan, and Mr. Nakajima is but one of several members of Nakajima Japan's Board of Directors with non-exclusive decision-making authority. Trial Tr. at 52:19–53:11, 99:21–24.

69. Nakajima USA was adequately capitalized as evidenced by its successful operation for over a decade prior to entering into the 2012 MSA with Syscom. Ina Decl., ¶ 2; Nagai Decl., ¶ 7; Nakajima Decl., ¶ 4; Ex. 4.

70. Nakajima Japan's Chief Financial Officer, Nobuo Onodera, and other members of Nakajima Japan's Board of Directors, dictated Nakajima USA's financial structure. Ina Decl., ¶¶ 3, 4.

71. Masahide Nakagawa served as Nakajima USA's Accountant, and Mr. Nakagawa later performed accounting functions for Neko World and Torrance Trading, including managing the companies' capital structures. Mr. Nakagawa testified that he received no direction from Mr. Nakajima regarding how to handle the Corporate Defendants' accounting matters. Nakagawa Decl., ¶ 2; Trial Tr. at 96:17–19, 96:24–97:1, 103:10–12, 103:18–21.

72. There is no evidence Mr. Nakajima was the driving force behind Nakajima Japan's Board of Directors decision to form Neko World and Torrance Trading to sell Sanrio and Peanuts Worldwide branded products, respectively. Ina Decl., ¶¶ 8, 10, 11; Trial Tr. at 66:17–67:7.

73. Nakajima USA and Nakajima Japan did not conceal the creation of new businesses that would sell Hello Kitty and Peanuts branded products from Syscom. Huang Decl., ¶¶ 5, 11; Trial Tr. at 34:14–17, 36:3–5; Ex. 223.

74. The decision to terminate the 2012 MSA was primarily made by Mike Ina (Corporate Defendants' Executive Officer), Chikako Horikoshi (Nakajima USA's Vice President), Nobuo Onodera (Nakajima Japan's Chief Financial Officer), Masahide Nakagawa (Corporate Defendants' Accountant), and legal counsel. Trial Tr. at 157:6–18. Mr. Nakajima did not personally direct Nakajima USA to terminate its MSA with Syscom. Ex. 17; Nagai Decl., ¶ 31; Trial Tr. at 105:20–22, 159:6–10.

75. Mr. Nakajima did not instruct anyone at Nakajima USA to transfer its assets to Neko World, Torrance Trading, or other third parties. Trial Tr. at 105:2–9.

76. Further, there was no commingling of assets between the Corporate Defendants and Mr. Nakajima because he did not appropriate Nakajima USA, Neko World, or Torrance Trading's inventory or equipment for his own use. Indeed, Mr. Nakajima received a salary from Nakajima USA but no other financial compensation from the Corporate Defendants. Trial Tr. at 101:4–18, 101:22–23, 102:4–22.

77. On these facts, and those set forth in the previous section, it is clear that Mr. Nakajima is not the Corporate Defendants' alter ego. The evidentiary record establishes that Nakajima Japan and its executive officers (of which Mr. Nakajima is only but one) funded Nakajima USA, decided to form Neko World and Torrance Trading to sell Sanrio and Peanuts Worldwide branded products, respectively, and dictated the transfer of assets between the Corporate Defendants.

78. The evidence also shows that Mr. Nakajima did not commingle his assets with the Corporate Defendants'; in fact, the Corporate Defendants' Accountant, Masahide Nakagawa, testified that Mr. Nakajima had no input regarding how he managed the companies' capital structures and handled accounting matters for the corporate entities.

79. While no one at Nakajima USA informed Syscom of internal discussions regarding whether Nakajima USA would proceed with Syscom's ERP system or continue using Sanrio's ERP Syscom, there is no evidence that Mr. Nakajima personally misrepresented or directed any employee to misrepresent to Syscom Nakajima USA's intention to fulfill its obligations under the 2012 MSA.

80. Ultimately, Syscom cannot carry its burden of proving that Mr. Nakajima is the Corporate Defendants' alter ego. Accordingly, the Court holds that Mr. Nakajima is not personally liable for the final arbitration award and the forthcoming judgment in this case under a theory of alter ego liability.

**2. Fraudulent Conveyance**

81. A fraudulent conveyance is "a transfer by the debtor of the property to a third person undertaken with the intent to prevent a creditor from reaching the interest to satisfy its claim." *Yaesu Elecs. Corp. v. Tamara*, 28 Cal. App. 4th 8, 13 (1994).

82. Under California's Uniform Fraudulent Transfer Act ("UFTA"), a fraudulent transfer occurs when a debtor makes a transfer or incurs an obligation "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1).

83. To assist in determining whether a transfer was made with the "actual intent to hinder, delay, or defraud," the UFTA identifies 11 badges of fraud:

(1) Whether the transfer or obligation was to an insider;
(2) Whether the debtor retained possession or control of the property transferred after the transfer;
(3) Whether the transfer or obligation was disclosed or concealed;
(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) Whether the transfer was of substantially all the debtor's assets;
(6) Whether the debtor absconded;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

13.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b)(1)–(11).

84. These "factors are intended to provide guidance to the trial court, not compel a finding one way or another." *Lachapelle v. Kim*, No. 15-CV-02195-JSC, 2015 WL 7753235, at *5 (N.D. Cal. Dec. 2, 2015) (internal quotation marks and citations omitted).

        **a.    Syscom Has Not Met its Burden of Proving that Mr. Nakajima Fraudulently Transferred Assets Between the Corporate Defendants**

85. Syscom argues that, as the President, CEO, and majority shareholder of each Corporate Defendant, Mr. Nakajima oversaw the transactions that left Nakajima USA with insufficient funds to fulfill its contractual obligations under the 2012 MSA. However, Syscom's fraudulent conveyance theory fails for many of the same reasons its alter ego theory fails.

86. As a preliminary matter, Syscom's argument that it is unable to recoup the value of its ERP services from Nakajima USA because Nakajima USA's assets were fraudulently transferred to Neko World and Torrance Trading is moot since all three Corporate Defendants were held jointly and severally liable in the final arbitration award.

87. With regards to Mr. Nakajima, Syscom presented no evidence that he appropriated any of Nakajima USA's assets for his own personal use or benefit.

88. Indeed, Mr. Nakajima is but one of several members of Nakajima Japan's Board of Directors and the evidence Syscom presented at trial did not establish by a preponderance that Mr. Nakajima had exclusive decision-making authority or control

14.

over the Corporate Defendants' actions. Thus, Nakajima Japan's decision to divest Nakajima USA of its assets in order to invest them into Neko World and Torrance Trading cannot be attributed to Mr. Nakajima alone.

89. Additionally, the evidence did not show that Mr. Nakajima concealed or directed Nakajima USA's employees to conceal the creation of Neko World or Torrance Trading from Syscom in order to induce Syscom's continued development of the ERP system.

90. Because Syscom's evidence did not establish that Mr. Nakajima coordinated, controlled, or concealed the transfer of assets from Nakajima USA to Neko World or Torrance Trading with the intent to "hinder, delay, or defraud," Syscom's fraudulent conveyance claim fails as to Mr. Nakajima.

## CONCLUSION

91. As to Defendant Shinji Nakajima, the Court finds against Syscom on its claims for (1) breach of contract; (2) account stated; (3) open book account; and (4) fraudulent conveyance.

92. Defendant shall file a Proposed Judgment in accordance with these findings within 14 days.

**IT IS SO ORDERED.**

Dated: February 4, 2020

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE

15.